1

2

3

4                           UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7    FRANK LUCIDO, et al.,                    Case No.  15-cv-00569-EMC

8                    Plaintiffs,

                                              **ORDER (1) GRANTING DEFENDANT'S**
9            v.                               **MOTION FOR SUMMARY**
                                              **JUDGMENT; (2) GRANTING IN PART**
10   NESTLE PURINA PETCARE COMPANY,           **AND DENYING IN PART**
                                              **DEFENDANT'S MOTIONS TO**
11                  Defendant.                **EXCLUDE THE EXPERT REPORT,**
                                              **OPINIONS, AND TESTIMONY OF DR.**
12                                            **QUESTEN AND DR. TEGZES; AND (3)**
                                              **DENYING PLAINTIFFS' MOTION TO**
13                                            **SUPPLEMENT THE RECORD AND**
                                              **MOTION TO SHORTEN TIME**
14

15                                            Docket Nos. 110, 114, 124, 215, 217, 219

16

17           Plaintiffs have filed a class action against Defendant Nestle Purina Petcare Co. ("Purina")

18   for "fail[ing] to disclose that Beneful dog food contains Industrial Grade Glycols, which are not

19   approved for use in food, mycotoxins [a group of toxins produced by fungus that occurs in grains],

20   lead, and/or arsenic."[1]  SAC ¶ 1; *see also* SAC ¶¶ 32-36.  The claims asserted include breach-of-

21   warranty claims (express and implied), claims for violation of state consumer protection statutes,

22   and claims for unjust enrichment.  Altogether, there are 78 claims implicating federal law and the

23   laws of 15 different states.  It appears that Plaintiffs are limiting their damages to the difference in

24

25   [1] Although the operative complaint references "Industrial Grade Glycol," which Plaintiffs
     characterize as "essentially propylene glycol manufactured to lesser, industrial standard,"
26   Plaintiffs seem to be abandoning any claim that Beneful contains Industrial Grade Glycol.  Docket
     No. 154-3 (opposition to summary judgment) (stating that "Dr. [Tegzes] no longer thinks that
27   Beneful contained Industrial Grade Glycol, but the presence of propylene glycol . . . is
     undisputed").  As discussed below, however, Plaintiffs have articulated a theory for relief based on
28   propylene glycol, in combination with mycotoxins and heavy metals.

value between what Beneful was purportedly worth and what Beneful was actually worth. *See, e.g.*, SAC ¶ 65 (alleging that consumers would not have paid any money for Beneful "had they known it contained Industrial Grade Gylcols, Mycotoxins, Arsenic, or Lead").

Currently pending before the Court are three motions: (1) Purina's motion to exclude the expert report, opinions, and testimony of Dr. Jena Questen; (2) Purina's motion to exclude the expert report, opinions, and testimony of Dr. John H. Tegzes; and (3) Purina's motion for summary judgment or, in the alternative, partial summary judgment. For the reasons discussed below, the Court **GRANTS** in part and **DENIES** in part the motions related to Dr. Questen and Dr. Tegzes and **GRANTS** the motion for summary judgment.

## I.    MOTION TO EXCLUDE – DR. QUESTEN

Purina has filed a *Daubert*[2] motion to exclude the expert report, opinions, and testimony of Dr. Questen.

A.    Background

Technically, there are two expert reports that were submitted by Dr. Questen: her original report and then her supplemental report. The original report contains the bulk of Dr. Questen's substantive opinions and reflects as follows.

Dr. Questen is a veterinarian. She has practiced for the past fifteen years. *See* Questen Rpt. ¶ 1. She has talked to over 4,000 dog owners over the course of her veterinary career, *see* Questen Rpt. ¶ 2; and even more when her experience as a veterinary technician is taken into account. *See* Supp. Questen Rpt. ¶¶ 1, 6-7 (adding that, prior to becoming a veterinarian, she worked as a veterinary technician and that, in that role, she "had 22,000 consultations with pet owners about the type of food they purchase, and that more than 10,000 of these consultations concerned dog food"). She has often talked to dog owners about "what they are currently feeding their dogs." Questen Rpt. ¶ 2. Plaintiffs asked Dr. Questen "to opine about whether a reasonable consumer would consider certain facts to be material when deciding whether to purchase Beneful." Questen Rpt. ¶ 5. Dr. Questen's opinions include the following: (1) "it is very

---

[2] *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993).

United States District Court
For the Northern District of California

important to a reasonable consumer to assume that Beneful is safe for dogs to eat" and (2) "it is very important to a reasonable consumer to assume all of Beneful's ingredients have been tested to ensure that they are free from toxins that could cause their dogs to get sick or die."  Questen Rpt. ¶¶ 8-9.

In its motion, Purina argues that the Questen reports should be excluded because Dr. Questen is not qualified to offer her opinions and, further, because her opinions are not reliable. Regarding qualifications, Purina points out that "Dr. Questen has no education, training, or experience in consumer purchasing behavior, in developing relevant methodology, or in conducting surveys or tests to assess such things."  Mot. at 4-5.  Regarding reliability, Purina primarily argues that Dr. Questen "has not applied reliable principles and methods, but instead has rested her conclusions upon mere intuition or general claims of expertise"; her "common knowledge and generalized interactions with pet owners in the course of her veterinary practice is scientifically irrelevant and not a proper methodology for studying consumer purchasing decisions."  Mot. at 6-7.  Purina also makes other unreliability arguments such as whether Dr. Questen actually authored her report and whether Dr. Questen spent an insufficient four hours in forming her opinions.

B.      Legal Standard

Federal Rule of Evidence 702 is the governing rule on expert testimony.  It provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)      the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)      the testimony is based on sufficient facts or data;
>
> (c)      the testimony is the product of reliable principles and methods; and
>
> (d)      the expert has reliably applied the principles and methods to the facts of the case.

1   Fed. R. Evid. 702.[3]

2       The Advisory Committee notes for Rule 702 underscore that experience may "provide a

3   sufficient foundation for expert testimony.  [Indeed,] the text of Rule 702 expressly contemplates

4   that an expert may be qualified on the basis of experience.  In certain fields, experience is the

5   predominant, if not sole, basis for a great deal of reliable expert testimony."  Fed. R. Evid. 702,

6   2000 Advisory Committee Notes.  But "[i]f the witness is relying solely or primarily on

7   experience, then the witness must explain how that experience leads to the conclusion reached,

8   why that experience is a sufficient basis for the opinion, and how that experience is reliably

9   applied to the facts."  Fed. R. Evid. 702, 2000 Advisory Committee Notes.

10       The Advisory Committee notes also point out that,

11          [w]hile the terms "principles" and "methods" may convey a certain
            impression when applied to scientific knowledge, they remain
12          relevant when applied to testimony based on technical or other
            specialized knowledge.  For example, when a law enforcement agent
13          testifies regarding the use of code words in a drug transaction, the
            principle used by the agent is that participants in such transactions
14          regularly use code words to conceal the nature of their activities.
            The method used by the agent is the application of extensive
15          experience to analyze the meaning of the conversations.  So long as
            the principles and methods are reliable and applied reliably to the
16          facts of the case, this type of testimony should be admitted.

17   Fed. R. Evid. 702, 2000 Advisory Committee notes.

18       Even if a witness cannot testify as an expert, he or she may still be able to testify as a

19   layperson.  "[L]ay testimony 'results from a process of reasoning familiar in everyday life,' while

20   expert testimony 'results from a process of reasoning which can be mastered only by specialists in

21   the field.'"  Fed. R. Evid. 701, 2000 Advisory Committee notes.  Layperson

22          testimony in the form of an opinion is limited to one that is:

23          (a)     rationally based on the witness's perception;

24          (b)     helpful to clearly understanding the witness's testimony or to
                    determining a fact in issue; and

25

26   _____

27   [3] Federal Rule of Evidence 104 is also implicated.  As indicated by the Advisory Committee notes
     of 2000, "the admissibility of all expert testimony is governed by the principles of Rule 104(a).
     Under that Rule, the proponent has the burden of establishing that the pertinent admissibility
28   requirements are met by a preponderance of the evidence."  Fed. R. Evid. 200, 2000 Advisory
     Committee notes.

4

1
        (c)        not based on scientific, technical, or other specialized
2
                  knowledge within the scope of Rule 702.

3
Fed. R. Evid. 701.

4
     As a point of reference,

5
> most courts have permitted the owner or officer of a business to
> testify to the value or projected profits of the business, without the
6
> necessity of qualifying the witness as an accountant, appraiser, or
> similar expert. *See, e.g.*, *Lightning Lube, Inc. v. Witco Corp.* 4 F.3d
7
> 1153 (3d Cir. 1993) (no abuse of discretion in permitting the
> plaintiffs owner to give lay opinion testimony as to damages, as it
8
> was based on his knowledge and participation in the day-to-day
> affairs of the business). Such opinion testimony is admitted not
9
> because of experience, training or specialized knowledge within the
> realm of an expert, *but because of the particularized knowledge that*
10
> *the witness has by virtue of his or her position in the business.*

11
Fed. R. Evid. 701, 2000 Advisory Committee notes (emphasis added).

12
C.    <u>Expert v. Lay Testimony</u>

13
     The Court agrees with Purina that Dr. Questen is not qualified as an expert to provide

14
opinions about what a reasonable consumer would consider material when deciding whether to

15
purchase dog food. Admittedly, Dr. Questen does have scientific, technical, or other specialized

16
knowledge; she is, after all, a veterinarian. However, Plaintiffs have not asked Dr. Questen to

17
provide opinions based on that specialized knowledge. In other words, Dr. Questen is not calling

18
upon her specialized knowledge as a veterinarian to render her opinions. In effect, she is simply

19
reporting back on what clients have indicated to her is important. She may get that knowledge by

20
virtue of being a veterinarian but her specialized knowledge as a veterinarian is not being called

21
into play substantively. In this regard, Dr. Questen's testimony is similar to the testimony of the

22
owner of a business about the value of the business – *i.e.*, she has certain knowledge by virtue of

23
her position but that is all. *See Henderson v. Corelogic Nat'l Background Data, LLC*, No.

24
3:12CV97, 2016 U.S. Dist. LEXIS 9885, at *7-9 (E.D. Va. Jan. 27, 2016) ("[C]ourts have

25
consistently distinguished between testimony requiring 'specialized knowledge' within the

26
purview of Rule 702, and 'particularized knowledge that the witness ha[s] by virtue of his

27
position,' which is a permissible foundation for lay testimony."); *cf. United States v. Valdivia*, 680

28
F.3d 33, 61 (1st Cir. 2012) (Lipez, J., concurring) ("If the [police] officer is being asked *to draw*

United States District Court
For the Northern District of California

*on specialized knowledge* acquired through experience and training to offer an opinion on the inculpatory significance of the particular conduct of the defendant, that officer is testifying as an expert witness.") (emphasis added); *United States v. Afyare*, 632 Fed. Appx. 272, 290 (6th Cir. 2016) ("[O]ne question is whether teachers and police officers drawing on their vocational experience to estimate a person's age are necessarily relying on 'specialized knowledge.'").

An analogy can also be made here to testimony by a police officer. For example, in *United States v. Ayala-Pizarro*, 407 F.3d 25 (1st Cir. 2005), the First Circuit noted:

> As to the testimony about how drug points operate, Officer Mulero stated that he had investigated, patrolled, or made arrests at drug points on more than 100 occasions. His testimony stated what occurred at those drug points. This testimony was based on the requisite personal knowledge under Fed. R. Evid. 602 and also met the requirements of Fed. R. Evid. 701, because it was based on "particularized knowledge that the witness [had] by virtue of his . . . position" as a police officer assigned to patrol the neighborhood.
>
> . . . . It required no special expertise for Officer Mulero to conclude, based on his observations, that places which sell drugs are often protected by people with weapons.

*Id.* at 29.

Accordingly, the Court grants Purina's motion to the extent that it shall not permit Dr. Questen to testify as an expert. However, that ruling does not preclude Dr. Questen from providing testimony as a layperson. For example, Dr. Questen could not testify that "it is very important to a reasonable consumer to assume that Beneful is safe for dogs to eat," Questen Rpt. ¶¶ 8-9, but she might still testify that, based on her experience as a veterinarian and veterinary technician, many or most clients have informed or otherwise indicated to her that the safety of pet food is an important concern. If there is a sufficient experiential basis, she might also be able to testify, *e.g.*, that many or most of her clients would make certain assumptions about safety testing of dog food, such as Beneful.

///

///

///

///

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

## II.     MOTION TO EXCLUDE – DR. TEGZES

Purina has also filed a *Daubert* motion to exclude the expert report, opinions, and testimony of Dr. Tegzes.

A.     Background

Dr. Tegzes's report and deposition testimony reflect, *inter alia*, as follows: Dr. Tegzes is "a licensed veterinarian with specialty board certification in veterinary toxicology."  Tegzes Rpt. ¶ 2.  He has been a veterinarian for twenty years, and a specialist in toxicology for twelve years.  *See* Tegzes Rpt. ¶ 2.

Plaintiffs' counsel gave to Dr. Tegzes a table that "list[ed] dog owners' reports of illnesses in approximately 1400 dogs that had consumed Beneful."  Tegzes Rpt. ¶ 7.  Counsel asked Dr. Tegzes to investigate what toxins could have caused the symptoms; he was not asked whether the symptoms could have been caused by something other than a toxin.  *See* Borders Decl., Ex. B (Tegzes Depo. at 42, 51-53).  Nor was he asked to perform a differential diagnosis into any of these cases or conduct any epidemiological analysis.

According to Dr. Tegzes,

> I essentially went through and tried to look for commonality [among the 1,400 cases].
>
> As a veterinary toxicologist, whenever I'm presented with a clinical case, I start with a history and try to delineate whether there are clinical effects referable to a specific organ system, and I start already to formulate some ideas about potential problems or potential toxins that might have contributed to the clinical effects that were demonstrated or that were seen.
>
> So I approached this the same way.
>
> . . . .
>
> With this case, there were multiple effects that were not exhibited by every single dog, and the age range and, again, the geographic locations made it much more challenging to try to find one thing that might have pointed to all of what was happening.

Murray Decl., Ex. 2 (Tegzes Depo. at 40-41).

Dr. Tegzes further testified:

**United States District Court**
For the Northern District of California

1

2      [W]hen I look at that data, that information, I start to think of toxins that perhaps are multisystem affecting – that *could* affect multiple organ systems.

3      It also indicated to me, again, my general diagnostic impressions from reviewing that is that this is something chronic versus something acute.

4

5      . . . .

6      . . . . So I created my own differential list of toxins that *could* affect multiple body systems, and that *could* appear in a food chronically.

7      . . . . [N]umber one was mycotoxins.

8      Number two would be heavy metals.

9  Murray Decl., Ex. 2 (Tegzes Depo. at 44, 46).

10      Dr. Tegzes took 28 out of the 1,400 cases (*i.e.*, 2%) and had the Beneful given to those

11  dogs analyzed at a lab.[4]  Plaintiffs note that the "sampl[ing] was limited by the fact that not all dog

12  owners had retained their food."  Mot. at 5.  The 28 food samples were tested for things (*e.g.*,

13  mycotoxins and heavy metals) that Dr. Tegzes is "most versed in and familiar with causing these

14  types of chronic effects."  Murray Decl., Ex. 2 (Tegzes Depo. at 46).  The test results indicated

15  that "[m]ycotoxins . . . were present in nearly every submitted sample," but they were within

16  regulatory limits – that is, within limits permitted by the FDA.  Tegzes Rpt. ¶ 9; *see also* Poppenga

17  Decl. ¶¶ 10, 12 (indicating that the "FDA has issued either action levels or advisory levels for

18  several common mycotoxins" and explaining that "[r]egulatory action levels are those

19  concentrations at or above which the FDA will consider whether to take legal action against a

20  product").[5]  The heavy metals arsenic and lead "were also detected in low concentrations," but

21  again within FDA limits.  Tegzes Rpt. ¶ 10.  Finally, "[p]ropylene glycol [an alcohol] was present

22  at greater than 1% concentration in 18 out of 28 samples, and at greater than 2% concentration in 4

23  out of 28 samples," but the FDA has classified propylene glycol as GRAS (generally regarded as

24  safe).  *See* Tegzes Rpt. ¶ 11.

25

26  _____

27  [4] Dr. Tegzes also had 5 competitor food samples tested.  Those results generally showed a fewer number of mycotoxins (*i.e.*, fewer types) in the competitor food samples compared to the tested Beneful food samples.  *See* Tegzes Rpt. ¶ 12.

28  [5] Dr. Robert H. Poppenga is Purina's expert.

8

According to Dr. Tegzes, the FDA limits for mycotoxins were established based on short-term acute exposure and therefore do not adequately take into account chronic exposure.  *See* Tegzes Rpt. ¶ 9 (stating that "many acute toxicity studies were used to establish tolerance limits"); *see also* Tegzes Rpt. ¶ 16 (explaining that mycotoxin studies on "food animals," *i.e.*, animals raised for human consumption, "have largely examined acute toxicity" because, "unlike dogs, food animals typically have very short lifespans"); Tegzes Rpt. ¶ 17 (asserting that "[t]he tolerance limits for chronic, lifelong exposure to mycotoxins in dogs is likely over-estimated because the studies used to establish tolerance limits were poorly designed[;] [w]hen mycotoxin studies have been conducted in dogs, they tend to be done over periods of weeks, rather than years").  Dr. Tegzes's concern is about the impact of chronic exposure to mycotoxins, especially multiple mycotoxins and/or mycotoxins in combination with heavy metals and/or propylene glycol.  *See generally* Tegzes Rpt. ¶¶ 9-11.

Dr. Tegzes notes:

> There is no single diagnostic test that can be performed to make a diagnosis of chronic mycotoxicosis.  Rather it is a diagnosis of exclusion when other diseases have been ruled out, and there are signs or lesions consistent with, but not pathognomonic for, mycotoxicosis.  There is no one test that can be used to rule in or rule out chronic mycotoxicosis.  In fact, simply finding a feed sample with either high or low concentrations of mycotoxins also cannot definitively diagnose *nor rule out* toxicosis.

Tegzes Rpt. ¶ 17 (emphasis in original).

Consistent with the above, Dr. Tegzes states that "[t]he testing of the [28] Beneful food samples . . . *did not rule in nor rule out* acute or chronic mycotoxicoses . . . ."  Tegzes Rpt. ¶ 18 (emphasis added).

The main opinions expressed by Dr. Tegzes in his report are as follows:

- "The research on chronic low level exposure to multiple mycotoxins supports the conclusion that exposure to mycotoxins at the levels found in Beneful poses a potentially significant health risk[] to dogs consuming Beneful."  Tegzes Rpt. ¶ 58.

- "While there have not been conclusive long-term studies of it, there is good reason to think that a synergistic effect of mycotoxins, heavy metals and gylcols could

adversely affect dogs' health."  Tegzes Rpt. ¶ 61.

- "Purina does not adequately test Beneful for mycotoxins because it (1) does not test all ingredients susceptible to mycotoxin contamination, (2) does not test all loads of brewers' rice for mycotoxins[6], (3) does not appear to follow its own policies with respect to adequate sampling, (4) only tests for, at most, two mycotoxins, (5) fails to chemically test the food of consumers who complain their dogs were sickened by Beneful, and (6) fails to conduct finished-product testing."  Tegzes Rpt. ¶ 54.

- "[I]t is material to a reasonable consumer whether Beneful is safe for dogs to eat" and "whether Beneful has been tested to ensure that it is free from toxins that could cause their dogs to get sick or die."  Tegzes Rpt. ¶¶ 63-64.

**B.    Consumer-Related Opinions**

Dr. Tegzes's consumer-related opinions are similar to those opinions offered by Plaintiffs' other expert, Dr. Questen.  With respect to Dr. Tegzes's consumer-related opinions, the analysis above regarding Dr. Questen's opinions is equally applicable here.  In short, Dr. Tegzes is not qualified as an expert to testify about consumer preferences; however, that does not preclude him from testing as a layperson about his experiences with clients.

**C.    Testing-Related Opinions**

Dr. Tegzes includes in his report not only opinions about consumer preferences but also opinions about the adequacy of Purina's testing procedures.  According to Dr. Tegzes,

> Purina does not adequately test Beneful for mycotoxins because it (1) does not test all ingredients susceptible to mycotoxin contamination, (2) does not test all loads of brewers' rice for mycotoxins, (3) does not appear to follow its own policies with respect to adequate sampling, (4) only tests for, at most, two mycotoxins, (5) fails to chemically test the food of consumers who complain their dogs were sickened by Beneful, and (6) fails to conduct finished-product testing.

Tegzes Rpt. ¶ 54.

---

[6] In June 2013, "the Food Safety Institute sent Purina a bulletin notifying it that one of its members had been rejecting loads of rice products with very high levels of aflatoxin [a kind of mycotoxin] contamination."  Tegzes Rpt. ¶ 44.

United States District Court
For the Northern District of California

In its motion, Purina argues that Dr. Tegzes is not qualified to opine on the adequacy of its testing procedures and further asserts that his opinions regarding adequacy are not reliable. The Court need not reach Purina's reliability argument because the Court agrees with Purina on Dr. Tegzes's lack of qualifications – *i.e.*, Dr. Tegzes "does not have knowledge, skill, experience, training, or education in the areas of pet food manufacturing, testing, sampling, and control procedures." Mot. at 12. Similar to above, Dr. Tegzes is not calling upon his specialized knowledge as a veterinarian to express his opinions about the adequacy of Purina's testing procedures. In fact, Plaintiffs admit as much in their opposition, stating as follows: "Dr. Tegzes's opinions are based on the fact that Purina failed to follow its own policies." Opp'n at 13; *see also* Borders Decl., Ex. B (Tegzes Depo. at 204) (stating that it was *not* his opinion that the sampling methodology used at Purina does not meet the industry standard). But if that is the case, then Plaintiffs' counsel can simply ask Purina about that alleged failure; Dr. Tegzes does not have any specialized knowledge on this point.[7]

Accordingly, the Court grants Purina's motion to exclude Dr. Tegzes from providing testimony related to testing procedures. In contrast to above, Dr. Tegzes cannot even testify as a layperson about testing procedures because he does not have personal experience which would serve as a basis for offering layperson testimony on such.

D.    Safety-Related Opinions

Finally, Dr. Tegzes expresses opinions about the potential health risk of Beneful:

- "The research on chronic low level exposure to multiple mycotoxins supports the conclusion that exposure to mycotoxins at the levels found in Beneful poses a potentially significant health risk[] to dogs consuming Beneful." Tegzes Rpt. ¶ 58.

---

[7] Plaintiffs cite *ADT Security Services, Inc. v. Swenson*, 276 F.R.D. 278 (D. Minn. 2011), in support of the proposition that expert testimony is permitted on "a company's failure to follow its own procedures." Opp'n at 13. However, notably, the expert in *ADT* did not just testify about a failure to follow internal policies and procedures. The expert – in security and alarms – testified about various "alleged deficiencies in the ADT security system," *e.g.*, "the various ways in which ADT failed to program, install, and test the system; train [the decedent] on the use of the system and warn her of its deficiencies; maintain the system; and comply with equipment manufacturers' specifications, industry standards, and its own internal policies and procedures." *ADT*, 276 F.R.D. at 312. As indicated by this language from the opinion, the expert's testimony was supported by far more than a failure to comply with internal policies and procedures.

- "While there have not been conclusive long-term studies of it, there is good reason to think that a synergistic effect of mycotoxins, heavy metals and gylcols could adversely affect dogs' health."[8]  Tegzes Rpt. ¶ 61.

Although the parties have often lumped these two opinions together in their papers, it is important to give them separate consideration.

Similar to above, Purina challenges Dr. Tegzes's authority to express these opinions based on both qualification and reliability grounds.  Here, the Court rejects Purina's contention that Dr. Tegzes is not qualified to express the above opinions.  While Dr. Tegzes may not have a specialty with mycotoxins, *see* Mot. at 9, he still has knowledge about them, particularly in light of his broader specialty of veterinary toxicology.  *See generally* 4-702 Weinstein's Fed. Evid. § 702.04[1][a] (stating that "it is an abuse of discretion for a trial court to exclude expert testimony solely on the ground that the witness is not qualified to render an opinion because the witness lacks expertise in specialized areas that are directly pertinent to the issues in question, if the witness has educational and experiential qualifications in a general field related to the subject matter of the issue in question"; citing cases in support).  *See, e.g.*, *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 753-54 (3d Cir. 1994) (finding abuse of discretion for trial court to preclude internist, who had "extremely broad experience in field of toxic substances," from testifying as to whether PCBs caused illness in plaintiffs; noting that, "[i]f the liberal standard of Rule 702 allows an engineer who teaches auto mechanics to testify in a products liability action about tractors, it surely allows a trained internist who has spent significant time reviewing the literature on PCBs to testify as to whether PCBs caused illness in plaintiffs"); *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2011) (in a RICO case where plaintiffs alleged that defendants solicited their investment in a real estate venture and then defrauded them, concluding that witness was qualified to offer expert opinion on plaintiffs' lost value damages based on his experience as a professional economist and

---

[8] Purina has submitted a competing expert declaration from Dr. Poppenga.  *See, e.g.*, Poppenga Decl. ¶ 10 ("Dr. Tegzes's hypothesis that the combination of mycotoxins, lead, arsenic, and propylene glycol in Beneful pet foods, all well within acceptable regulatory or scientifically accepted limits, caused the illnesses exhibited by allegedly affected dogs is not the result of valid scientific methodology, is not supported by any scientific studies, and is mere speculation.").

United States District Court
For the Northern District of California

his background in estimating damages; that he had "no real estate development experience" went "more to the foundation [for] his testimony than . . . his qualifications to calculate Plaintiffs' damages"); *Popovich v. Sony Music Entm't, Inc.*, 508 F.3d 348, 359 (6th Cir. 2007) (in a case where plaintiff alleged, *inter alia*, reverse passing off and breach of contract, agreeing with district court that witness was qualified to testify about damages because he had "'extensive experience in business valuation, including valuation of business units and business assets,'" even though he had "minimal experience in evaluating a contract or logo right"); *cf. Pages-Ramirez v. Ramirez-Gonzalez*, 605 F.3d 109, 115-16 (1st Cir. 2010) (finding abuse of discretion where trial court concluded that proffered expert witness was unqualified; stating that "[t]he dispositive question is not whether an expert is board certified in a particular medical specialty").

While Dr. Tegzes's qualifications are not an issue, the Court nevertheless finds Purina's reliability argument persuasive.  In *Daubert*, the Supreme Court listed factors that a court may consider in

> determining whether expert testimony is sufficiently reliable to be admitted into evidence, including: (1) whether the scientific theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether there is a known or potential error rate, and (4) whether the theory or technique is generally accepted in the relevant scientific community.

*Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1064 (9th Cir. 2002).  These factors are not exhaustive.  Indeed, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court emphasized that "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."  *Id.* at 153; *see also United States v. Alatorre*, 222 F.3d 1098, 1101 (9th Cir. 2000) (stating that "'the test of reliability is "flexible," and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case[;] [r]ather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination'" – "'the gatekeeping inquiry must be tied to the facts of a particular case'").

In assessing the reliability of Dr. Tegzes's safety-related opinions, the Court first addresses

United States District Court
For the Northern District of California

Plaintiffs' contention that these opinions are not ones about *causation* but rather simply opinions about *risk*. *See* Opp'n at 10 (asserting that Dr. Tegzes has "not offered an expert opinion regarding causation," but rather just an opinion on "risks that Beneful posed to dogs"); *see also* Murray Decl., Ex. 2 (Tegzes Depo. at 10) (agreeing that not providing an opinion as to any specific harm or diagnosis as to any of Plaintiffs' dogs). Plaintiffs maintain that causation is not a necessary part of their case because they have dropped their negligence claims[9] and are resting on a failure-to-disclose theory only – therefore, "[a]ll they need to show is that it would be material to a reasonable consumer to know that Beneful contains various toxins and that such toxins pose a risk to their dogs' safety." Opp'n at 9. Plaintiffs assert that, because Dr. Tegzes is simply opining about a risk, and not causation, it does not matter that he did not do a differential diagnosis (*i.e.*, rule out possible nontoxic causes) or "examine any of the allegedly afflicted dogs [or] their veterinary records" or "consult with any treating physicians." Mot. at 6.

Plaintiffs' position is not persuasive. Even if Dr. Tegzes is not being offered as to definitive causation (*e.g.*, the cause of illness in the dogs he studied), his opinions about risk is predicated on the possibility that chronic exposure to mycotoxins, etc. at the levels at issue in Beneful products (which were below FDA limits) cause medical problems for dogs. Causation is relevant to the assertion of risk. Absent any realistic possibility of causation, Dr. Tegzes cannot testify as to risk.

As noted, Dr. Tegzes reached no conclusion as to causation based on his study of the sample of dogs and Beneful food; he conceded he could neither rule in or out chronic mycotoxicoses. Plaintiffs protest that Dr. Tegzes's opinions about risk are nevertheless reliable because he "consulted scientific literature" and evaluated "common patterns in the symptoms of the 1,400 dogs and the test results." Opp'n at 10; *see also* Opp'n at 6.

Premising reliability on his review of the 1,400 dogs, however, is problematic because, as Purina points out, Dr. Tegzes only analyzed them with an eye as to what toxins *could* have caused

---

[9] In the SAC, Count 44 is a claim for negligence brought on behalf of a Montana class; also, Count 45 is a claim for strict products liability brought on behalf of a Montana class. However, Plaintiffs stipulated to dismissal of those claims. *See* Docket No. 108 (stipulation and order).

**United States District Court**
For the Northern District of California

1   the symptoms presented and did not take into account that there could be causes for the symptoms

2   completely independent of any toxins.  His conclusions are, in fact, entirely inconclusive.  As a

3   result, in order for Dr. Tegzes's assessment of the 1,400 dogs to have relevant and probative value,

4   there must be a scientific basis for his opinions that chronic exposure to mycotoxins, etc. at the

5   levels at issue may cause health problems in dogs.  For this, Dr. Tegzes relies solely on the

6   scientific literature.

7          Although Plaintiffs did not provide copies of the scientific literature on which Dr. Tegzes

8   relied as part of their summary judgment briefing, the Court asked Plaintiffs to file, as part of the

9   record, three articles that were identified in Dr. Tegzes's expert report and that appeared to be the

10   main foundation for his safety-related opinions.  Those articles shall hereinafter be referred to as

11   the Yao, Bennett, and Bohm articles.  *See* Tegzes Rpt. ¶¶ 22, 24, 26; *see also* Docket No. 209

12   (articles).  The hearing on Purina's motion established that the two articles of significance are the

13   Bennett and Bohm articles.

14          Having reviewed those articles, the Court finds no basis for Dr. Tegzes's opinion that,

15   "there is good reason to think that a synergistic effect of mycotoxins, heavy metals and gylcols

16   could adversely affect dogs' health."  Tegzes Rpt. ¶ 61.  The articles discuss only mycotoxins, not

17   mycotoxins combined with either heavy metals and/or glycols.  Moreover, in his report, Dr.

18   Tegzes acknowledged that "research is lacking about how these combinations of contaminants

19   affect the health of dogs over the lifespan, when consistently fed these contaminants over periods

20   of years."  Tegzes Rprt. ¶ 18.

21          That leaves the Court with Dr. Tegzes's opinion that "exposure to mycotoxins at the levels

22   found in Beneful poses a potentially significant health risk[] to dogs consuming Beneful."  Tegzes

23   Rpt. ¶ 58.  The problem for Plaintiffs is that, here as well, the articles are of no support to Dr.

24   Tegzes.

25          For an article to support Dr. Tegzes, two pieces of information need to be known: (1) what

26   specific low levels of mycotoxins present a safety concern and (2) what exact levels of mycotoxins

27   were actually found in Beneful.  The first piece of information is needed because Plaintiffs are not

28   contending that *any* level of mycotoxin is a health risk.  Indeed, if that were Plaintiffs' position,

United States District Court
For the Northern District of California

then Plaintiffs would effectively be advocating for a warning on practically all food products

because, as Plaintiffs do not dispute, mycotoxins are effectively ubiquitous. *See, e.g.*, Poppenga

Decl. ¶ 28 (stating that "[m]ycotoxins, as naturally-occurring chemicals, are ubiquitous in many

plant products, especially cereal grains"). Mycotoxins exist at some level naturally. Indeed, the

impossibility of eliminating all mycotoxins underlies the FDA's tolerance for certain levels of

mycotoxins in pet food and even human food. The second piece of information is needed because,

without knowing what levels of mycotoxins are actually found in Beneful, it is impossible to make

a comparison to what levels present a safety concern and say whether there is a real health risk.

With respect to the Bennett article, it fails to provide information on (1). The article states

in relevant part:

> [M]ycotoxicoses, like all toxicological syndromes, can be
> categorized as acute or chronic. Acute toxicity generally has a rapid
> onset and an obvious toxis response, while chronic toxicity is
> characterized by low-dose exposure over a long time period,
> resulting in cancers and other generally irreversible effects.
> Accepting that it is often difficult to distinguish between acute and
> chronic effects, many papers on mycotoxicoses blur this basic
> dichotomy entirely, and it is not always easy to interpret the
> published data on purported health effects. Almost certainly, the
> main human and veterinary health burden of mycotoxin exposure is
> related to chronic exposure (e.g., cancer induction, kidney toxicity,
> immune suppression). However, the best-known mycotoxin
> episodes are manifestations of acute effects (e.g., turkey X
> syndrome, human ergotism, stachybotryotoxicosis).

Docket No. 209 (Bennett at 499). All that Bennett does is discuss a health risk based on low-level

exposure. It provides no specifics about what low levels actually present a risk – or what levels

constitute a risk when exposure is chronic. Moreover, Dr. Tegzes, in his report, fails to provide

information on (2). From his report, all that is known is that the mycotoxin levels for the tested

Beneful samples fell within tolerance limits, but there is no information in the record as to what

the actual levels were. While, at the hearing, Plaintiffs offered to cure this deficiency,[10] the Court

---

[10] At the hearing, Plaintiffs stated that the testing results showing the exact mycotoxin levels were
given to Purina and suggested that the only reason why they did not include the results was
because they were trying to reduce the amount of information for the Court. This justification,
however, is weak, especially when it is taken into account that Plaintiffs submitted more than 100
exhibits in opposition to Purina's motion for summary judgment (most of marginal relevance). In
any event, even if Plaintiffs were trying to limit the record to only critical exhibits, that does not

**United States District Court**
For the Northern District of California

1    rejected this offer.  Plaintiffs were given an adequate opportunity to create a record, both for the

2    *Daubert* motion and for the motion for summary judgment, and they cannot now seek to

3    supplement because the viability of their case is in danger.[11]

4          As for the Bohm article, Plaintiffs' failure to provide information on (2) is again

5    problematic.  And even if Plaintiffs had provided that information about levels in Beneful, the

6    Bohm article would still be of no support.   While the Bohm article provides some information

7    about mycotoxin levels found in pet foods, and Plaintiffs represented that the mycotoxin levels

8    found in Beneful were similar to the mycotoxin levels discussed in Bohm, Bohm does *not* express

9    the opinion that these levels of mycotoxins actually present a health risk.  Rather, while Bohm

10   indicates some concern about the mycotoxin levels, the article explicitly concludes that "*nothing is

11   known* about the synergistic or chronic effects of low mycotoxin exposure on the health risks for

12   dogs." Docket No. 209 (Bohm at 152) (emphasis added).  In other words, at most, Bohm simply

13   indicates – as Dr. Tegzes even suggested in his report – that more research needs to be done. *See,*

14   *e.g.*, Tegzes Rpt. ¶ 22 ("[I]t is not unreasonable to suspect that chronic exposure could lead to

15   various cancers in dogs.  More research should be conducted.").

16         In this regard, the Court finds the Eleventh Circuit's opinion in *Kilpatrick v. Breg, Inc.*,

17   613 F.3d 1329 (11th Cir. 2010), instructive.  In *Kilpatrick*, the plaintiff claimed that a medical pain

18   pump manufactured by the defendant-company (for use during and after surgery) had injured him.

19

20   _____

21   explain why they failed to provide the most significant evidence – what the actual mycotoxin
     levels found in Beneful were.

22         Post-hearing, Plaintiffs formally moved for leave to supplement the record with the testing
     results. *See* Docket No. 217 (motion).  Plaintiffs fail to explain why they did not include this
23   information in their papers on the motion (information already in their possession), waiting instead
     to hear comments from the Court at the hearing before moving to supplement the record.
24   Moreover, for the reasons stated herein, even if this information were part of the record, it would
     not change the fact that the scientific evidence does not establish a health risk due to long term-
25   exposure at the levels involved herein.  Accordingly Plaintiffs' motion is denied.  Plaintiffs'
     accompanying motion to shorten time on the motion for leave to supplement is denied as moot.

26   [11] A similar problem arises with respect to Plaintiffs' reliance on an internal Purina document
27   which indicates that low-level exposure to aflatoxin (a kind of mycotoxin) can cause liver cancer.
     *See* Cereghino Decl., Ex. 34 (NPPC 0037698).  First, the Purina document does not reflect what
     constitutes low-level exposure.  Second, the Court still has no information as to what exact levels
28   of mycotoxins were found in the tested Beneful samples to see if a comparison can be made.

United States District Court
For the Northern District of California

The plaintiff offered an expert on causation.  The expert (a doctor) opined that the use of pumps to dispense anesthetic directly to the shoulder joint can cause glenohumeral chondrolysis and that the use of the pump in this manner had caused the plaintiff's injuries.  *See id.* at 1333-34.  The district court held that, although the doctor was qualified to testify as an expert, his causation testimony was unreliable – for example, "the medical literature on which [the doctor] based his conclusions did not reliably support his general causation opinion."  *Id.* at 1334.  On appeal, the Eleventh Circuit agreed.

In holding such, the appeals court began by noting that the expert "did not conduct any tests himself, and did not rely on any epidemiological studies of human beings that connect intra-articular pain pumps or the use of bupivacaine with glenohumeral chondrolysis."  *Id.* at 1336.  The court acknowledged that "[t]he absence of such evidence is not fatal, but makes [the expert's] task to show general causation more difficult."  *Id.*  As for the medical literature on which the expert relied for his causation opinion, the court pointed out that "[n]one of them offered an ultimate conclusion as to the general causation of glenohumeral chondrolysis in humans."  *Id.* at 1337.  For example, in one study, the authors stated that "'[n]o etiology [of chondrolysis] has been firmly identified . . . ' and that further research was needed.  All that the authors were able to state was that the pain pumps eluting Marcaine 'appear highly associated with post-arthroscopic glenohumeral chondrolysis,'" but an association is "'far removed from proving causation.'"  *Id.* at 1337-38 (emphasis omitted).  Another article similarly stated that "'[t]he etiology of glenohumeral chondrolysis may be multifactorial.  Future research is required to determine the cause, and proper prevention, of shoulder chondrolysis.'"  *Id.* at 1340.  The expert admitted that this statement remained correct two years later at the time of his deposition."  *Id.* at 1340.

The facts in the instant case are similar to those in *Kilpatrick*.  Like the expert in *Kilpatrick*, Dr. Tegzes did not conduct any tests himself or rely on any epidemiological studies of animals but instead relied on scientific literature.  That literature – like the literature in *Kilpatrick* – indicated at most that more research needed to be conducted.  Like the Eleventh Circuit, this Court "does not intend to suggest that in order to survive *Daubert* review, a methodology based on a review of existing literature on the subject must rely on articles that draw a direct, concrete, and

United States District Court
For the Northern District of California

1 absolute causal connection." *Id.* at 1341 n.18.  But even so, here, Dr. Tegzes's opinion is not

2 reliable because the scientific literature he invokes is either too speculative or too imprecise.

3 Simply put, Dr. Tegzes cites *no* epidemiological evidence that long-term exposure to mycotoxins

4 at levels below the limits set by the FDA leads to serious health risks for dogs.

5       Accordingly, the Court concludes that Dr. Tegzes shall not be permitted to testify as an

6 expert about the purported health risks of mycotoxins, either alone or in conjunction with other

7 mycotoxins, heavy metals, and/or glycols.

8 ### III.  MOTION FOR SUMMARY JUDGMENT

9       Having resolved the Questen and Tegzes motions, the Court now turns to Purina's motion

10 for summary judgment.  Purina moves on all claims asserted by Plaintiffs.  As noted above, the

11 claims asserted by Plaintiffs include breach-of-warranty claims (express and implied), claims for

12 violation of state consumer protection statutes, and claims for unjust enrichment.  Below are some

13 representative claims as pled in the operative second amended complaint ("SAC"):

14     • *Breach of express warranty.*  Count 4 is a claim for breach of express warranty

15       under Colorado law.  Under Colorado law, "[a]ny affirmation of fact or promise

16       made by the seller which relates to the goods and becomes part of the basis of the

17       bargain creates an express warranty that the goods shall conform to the affirmation

18       or promise."  Colo. Rev. Stat. § 4-2-313(1)(a).  Also, "[a]ny description of the

19       goods which is made part of the basis of the bargain creates an express warranty

20       that he goods shall conform to the description."  *Id.* § 4-2-313(a)(b).  Plaintiffs

21       allege that Purina makes express warranties on the packaging of Beneful that

22       indicate the product is, in effect, safe – *e.g.*, "100% Complete and Balanced

23       Nutrition"[12]; "Made with wholesome rice"; and "Healthy."  *See* SAC ¶ 87.

25 [12] In its reply brief, Purina argues that "100% Complete and Balanced Nutrition" is a statement "specifically defined by the Association of American Feed Control Officials . . . and relates solely to nutritional adequacy," Reply at 14 n.18, not safety.  "AAFCO is a voluntary organization of local, state, and federal agencies operating in cooperation with FDA, which, among other things, develops standards for pet food manufacturers for product safety, labeling, ingredient lists, and nutritional formulas, and prepares model regulations for states and other jurisdictions to codify in order to implement a uniform set of regulations regarding animal feed, including pet food."  Mot. at 7 n.6.

United States District Court
For the Northern District of California

1    "[B]ecause Beneful contained Industrial Grade Glycols, Mycotoxins, Lead, or

2    Arsenic, it did not conform to the affirmations, promises and descriptions

3    previously mentioned, resulting in breaches of express warranties."  SAC ¶ 88.

- *Breach of implied warranty.*  Count 5 is a claim for breach of the implied warranty of merchantability under Colorado law.  Under Colorado law, "a warranty that the goods shall be merchantable is implied in a contract for sale if the seller is a merchant with respect to goods of that kind" and, for goods to be merchantable, they must "[p]ass without objection in the trade under the contract description," "[a]re fit for the ordinary purposes for which such goods are used"; "[a]re adequately contained, packaged, and labeled as the agreement may require," and "[c]onform to the promises or affirmations of fact made on the container or label if any."  Colo. Rev. Stat. § 4-2-314(1)-(2).  In the SAC, Plaintiffs maintain that each of these factors was violated.  For example, "Beneful will not pass without objection in the trade under the description of dog food, because it contained Industrial Grade Glycols, Mycotoxins, Lead or Arsenic."  SAC ¶ 95.  Also, "Beneful was not fit for the ordinary purpose for which it is used, which is safely feeding dogs," and "Beneful was not adequately contained, packaged or labeled because it failed to warn of the dangers of its consumption by dogs."  SAC ¶ 95.

- *Violation of consumer protection statute.*  Count 2 is a claim for unfair competition in violation of California Business & Professions Code § 17200.  Plaintiffs allege that Purina committed (1) unlawful practices because it violated the California Consumer Legal Remedies Act ("CLRA") (*see, e.g.*, Cal. Civ. Code s 1770(a)(5), (7)[13]); (2) unfair practices because "it manufactured and distributed Beneful, which is harmful to dogs, despite knowledge of the defect, and in a manner that would deceive a reasonable consumer"; and (3) deceptive practices because it, *inter alia*,

---

[13] The CLRA makes it unlawful to, *e.g.*, "[r]epresent[] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have" and to "[r]epresent[] that goods or services are of a particular standard, quality, or grade . . . if they are of another."  Cal. Civ. Code § 1770(a)(5), (7).

20

represented that Beneful was healthy and failed "to disclose that Beneful contained Industrial Grade Glycols, Mycotoxins, Arsenic or Lead."  SAC ¶ 74.  Under California law, nondisclosure or concealment may constitute actionable fraud when, *e.g.*, "the defendant had exclusive knowledge of material facts not known to the plaintiff" or "the defendant makes partial representations but also suppresses some material facts."  *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997).  Material information is "the type of information that would affect a reasonable consumer's purchasing decisions."  *Hodsdon v. Mars, Inc.*, 162 F. Supp. 3d 1016, --- (N.D. Cal. 2016); *see also Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 531 (C.D. Cal. 2012) (stating that "[w]hether an omission is material is a fact-intensive question that asks whether 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question'").

- *Unjust enrichment.*  Count 7 is a claim for assumpsit/money had and received/unjust enrichment/restitution under Colorado law.  Plaintiffs allege that consumers would not have purchased Beneful "had the true facts" about the product been disclosed.  SAC ¶ 118.

As indicated by the above, Plaintiffs' various claims are all predicated on there being a health risk associated with Beneful.  Both parties have submitted a large amount of evidence for the Court's consideration regarding Beneful's safety, but the critical evidence boils down to the expert reports/declarations.

A.   Legal Standard

Federal Rule of Civil Procedure 56(a) provides a court shall grant summary judgment to the moving party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could

1   reasonably find for the [nonmoving party]." *Id.* at 252.  At the summary judgment stage, evidence

2   must be viewed in the light most favorable to the nonmoving party and all justifiable inferences

3   are to be drawn in the nonmovant's favor.  *See id.* at 255.

4       Where the plaintiff has the ultimate burden of proof, the defendant may prevail on a

5   motion for summary judgment simply by pointing to the plaintiff's failure "to make a showing

6   sufficient to establish the existence of an element essential to [the plaintiff's] case."  *Celotex Corp.*

7   *v. Catrett*, 477 U.S. 317, 322 (1986).

8   B.   Defendant's Arguments

9       In its summary judgment motion, Purina makes the following arguments: (1) all of

10  Plaintiffs' claims should be dismissed because there is no evidence that Beneful is unsafe for dogs;

11  (2) any claims based on a theory of failure to disclose should be dismissed because there is no

12  evidence that Beneful is unsafe for dogs; (3) the claims for breach of express warranty should be

13  dismissed because there is no evidence that Beneful is unsafe for dogs; (4) the claims for breach of

14  the implied warranty of merchantability should be dismissed because there is no evidence that

15  Beneful is unsafe for dogs; (5) the claims for unjust enrichment should be dismissed because there

16  is no evidence that Beneful is unsafe for dogs; and (6) Plaintiffs lack standing.[14]  As is clear from

17  this list, the bulk of Purina's arguments are duplicative, boiling down to the contention that there

18  is no evidence that Beneful is unsafe.  And Purina's contention that there is no evidence that

19  Beneful is unsafe largely relies on its challenge to the opinions offered by Plaintiffs' expert Dr.

20  Tegzes.  In light of the above analysis, Dr. Tegzes's opinion on safety of Beneful is not

21  admissible.  As all of Plaintiffs' claims require evidence of a health risk from Beneful, those

22  claims cannot be sustained.

23  C.   Improper Testing Theory

24      Based on their papers, Plaintiffs place significant weight on the argument that Beneful is

25  unsafe because Purina did not properly test the product (*e.g.*, not all raw ingredients were tested

26

27  [14] In its opening brief, Purina also argued that the claims for breach of the implied warranty of
    merchantability based on Illinois, Ohio, Florida, New York, and Washington law should be
    dismissed because Plaintiffs are not in privity with Purina.  Plaintiffs have conceded the validity of
28  this sixth argument.  *See* Opp'n at 27 n.9.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  for mycotoxins; not all mycotoxins were tested for[15]; and the finished product was not tested for

2  mycotoxins).  There are several problems with Plaintiffs' improper testing theory.

3         First, Plaintiffs did not fairly allege this specific theory in the operative complaint.  While

4  the SAC does contain one allegation that Purina breached its duty of care by selling Beneful

5  "without adequate quality controls and testing," SAC ¶ 485, that allegation was found in the claim

6  for negligence under Montana law only, and Plaintiffs voluntarily dismissed that claim (as well as

7  the related strict product liability claim).  *See* Docket No. 107 (stipulation).

8         Second, even if the above did not bar Plaintiffs from proceeding with their improper

9  testing theory, Plaintiffs' theory is largely dependent on the testimony of Dr. Tegzes and, as noted

10  above, Dr. Tegzes shall not be permitted to opine on any alleged improper testing because he is

11  not qualified to so testify.

12         Third, even if Plaintiffs do not need to rely on Dr. Tegzes and are simply claiming

13  improper testing on the basis that Purina failed to comply with its own policies and practices on

14  testing, any such failure is not – *by itself* –enough to show that Beneful is unsafe.  For example, if

15  Purina's policies and practices exceeded the industry standard, a failure to comply with those

16  policies and practices would not necessarily establish that Beneful is unsafe.  Indeed, the Court

17  notes that the 28 samples of Beneful that were tested by Plaintiffs revealed that levels of

18  mycotoxins and heavy metals were within limits permitted by the FDA.  And there is no evidence

19  in this record that those levels of mycotoxins pose a safety risk.

20         Accordingly, the Court rejects Plaintiffs' theory of improper testing and grants Purina

21  partial summary judgment on that issue.

22         Without the improper testing theory, the Court is left with Plaintiffs' contention that there

23  is a genuine dispute of material fact regarding the safety of Beneful based on, in particular, (1) the

24  fact that thousands of dogs (more precisely, 1,400) got sick and/or died after eating Beneful (and

25  in some cases got healthier after stopping eating Beneful) and (2) the opinions of Dr. Tegzes.

26

27

28

---

[15] *But see* Poppenga Decl. ¶ 15 ("Although many secondary fungal metabolites [*i.e.*, mycotoxins] have been identified, only a few are considered important from a food safety standpoint.").

D.      Fourteen Hundred Cases and Dr. Tegzes's Opinions

The Court rejects Plaintiffs' position that a reasonable jury could find Beneful unsafe based on the mere fact that 1,400 dogs ate Beneful and got sick or died thereafter (or that some even improved after stopping eating Beneful).  This is insufficient evidence of causation.  Indeed, there is no evidence such as an evaluation by a veterinarian that a dog actually *did* get sick or die because it ate Beneful.  Notably, Plaintiffs dropped their original first named plaintiff (Frank Lucido) because it was determined that his dog had actually died of a heart tumor.  *See* Mot. at 1.

Plaintiffs' case for Beneful being unsafe, therefore, ultimately turns on Dr. Tegzes's opinions.  But, as discussed above, the Court finds Dr. Tegzes's safety-related opinions unreliable, and therefore Plaintiffs' case has no evidentiary support.  Without this support, Purina is entitled to partial summary judgment here as well.

## IV.      **CONCLUSION**

For the foregoing reasons, the Court hereby rules as follows: (1) the motion to exclude Dr. Questen is granted in part and denied in part; (2) the motion to exclude Dr. Tegzes is granted in part and denied in part; and (3) the motion for summary judgment is granted in its entirety.  In addition, Plaintiffs' motion for leave to supplement and to shorten time are denied.

The Clerk of the Court is instructed to enter judgment in Purina's favor in accordance with this opinion and close the file in this case.

This order disposes of Docket Nos. 110, 114, 124, 215, 217, and 219.


**IT IS SO ORDERED**.


Dated: November 17, 2016

_____
EDWARD M. CHEN
United States District Judge